ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
LAW OFFICES OF ANDREW L. PACKARD
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062
andrew@packardlawoffices.com
wncarlon@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE,<br><br>          Plaintiff,<br><br>     v.<br><br>SOILAND CO., INC., MARK SOILAND, and MARLENE SOILAND,<br><br>          Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1387)** |

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA"), by and through its

counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provision of the Federal

Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 (the "Clean Water Act", the "CWA" or "the

Act") against Soiland Co., Inc., Mark Soiland, and Marlene Soiland ("Defendants").  This Court has

subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section

505(a)(1) of the Act, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331 (an action arising under the laws of the

United States).  Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. §

1365(a)(1)(A) (citizen suit to enforce effluent standard or limitation).  The relief requested is authorized

Complaint for Declaratory and Injunctive Relief and Civil Penalties

1

pursuant to 33 U.S.C. §1365(a) (injunctive relief), 1319(d) (civil penalties), and 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2.    On November 14, 2017, Plaintiff provided written notice to Defendants, via certified mail, of Defendants' violations of the Act ("Notice Letter"), and of its intention to file suit against Defendants, as required by the Act.  *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1).  Plaintiff mailed a copy of the Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); and the Executive Officer of the Regional Water Quality Control Board, North Coast Region ("Regional Board"), pursuant to 40 C.F.R. § 135.2(a)(1).  A true and correct copy the Notice Letter is attached hereto as **Exhibit A**, and is incorporated by reference.

3.    More than sixty days have passed since Plaintiff served the Notice Letter on Defendants and the agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced nor is diligently prosecuting a court action to redress the violations alleged in this Complaint.  This action's claims for civil penalties are not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.    Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this District. Venue is also proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.  Intra-district venue is proper in San Francisco, California, because the sources of the violations are located within Sonoma County.

## II.    INTRODUCTION

5.    This Complaint seeks relief for Defendants' violations of the CWA at the approximately 121-acre aggregate and soils processing facility and quarry ("the Facility") located at 7171 Stony Point Road, in Cotati, California.  Defendants discharge pollutant-contaminated storm water from the Facility into storm water conveyances that discharge to Washoe Creek, which drains to Laguna de Santa Rosa, which drains to Santa Rosa Creek, which drains to Mark West Creek, which drains to the Russian River

("Impacted Waters").  Washoe Creek, Laguna de Santa Rosa, Santa Rosa Creek, Mark West Creek and the Russian River are waters of the United States within the meaning of the Clean Water Act. Defendants are in violation of both the substantive and procedural requirements of the CWA.

6.     Defendants' discharges of polluted storm water from the Facility violate Section 301 of the Act, which prohibits the discharge of storm water associated with industrial activities to waters of the United States except in compliance with the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.  These violations are ongoing and continuous.

7.     Defendants' discharges of polluted storm water from the Facility violate the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ, and Water Quality Order No. 14-0057-DWQ, NPDES General Permit No. CAS000001 (hereinafter "General Permit" or "Permit").  Defendants' violations of the permitting, filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

8.     The failure on the part of industrial facility operators, such as Defendants, to apply for and comply with the General Permit is recognized as a significant cause of the continuing decline in water quality of receiving waters, such as the Russian River.  The general consensus among regulatory agencies and water quality specialists is that storm water pollution amounts to more than half the total pollution entering the aquatic environment each year.  With every rainfall event, hundreds of thousands of gallons of polluted storm water originating from industrial facilities discharge to the Impacted Waters.

III.    **PARTIES**

9.     Defendant Soiland Co., Inc. is a California corporation doing business as Stony Point Rock Quarry.

10.     Defendant Mark Soiland is the Chief Executive Officer of Soiland Co., Inc. and the President of Stony Point Rock Quarry.

Complaint for Declaratory and Injunctive Relief and Civil Penalties

11.     Defendant Marlene Soiland is the Secretary and Chief Financial Officer of Soiland Co., Inc.

12.     Defendants own and operate the Facility, an approximately 121-acre aggregate and soils processing facility and quarry located at 7171 Stony Point Road, Cotati, California.

13.     Defendants' primary industrial activities at the Facility include mining and blasting activities in an approximately 17-acre rock quarry, aggregate and rock material crushing, processing, stockpiling and recycling (concrete, tile, porcelain and asphalt shingles); and a landscape materials yard.

14.     Plaintiff CSPA is a non-profit public benefit corporation organized under the laws of California, with its main offices in Stockton, California.  CSPA is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of California waters, including the waters into which Defendants discharge polluted storm water.  To further its goals, CSPA actively seeks federal and state agency implementation of state and federal water quality laws, including the CWA, and as necessary, directly initiates enforcement actions on behalf of itself and its members.

15.      Members of CSPA, including citizens, taxpayers, property owners, and residents, live, work, travel and recreate on and near the Impacted Waters, into which Defendants cause pollutants to be discharged.  These members of CSPA use and enjoy the Impacted Waters for recreational, educational, scientific, conservation, aesthetic and spiritual purposes.  Defendants' discharges of storm water containing pollutants impairs each of those uses.  Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act and the General Permit.

16.     Members of CSPA reside in California and use and enjoy California's numerous rivers for recreation and other activities.  Members of CSPA use and enjoy the Impacted Waters, into which Defendants have caused, are causing, and will continue to cause, pollutants to be discharged.  Members of CSPA use these areas to fish, boat, kayak, swim, bird watch, view wildlife, and engage in scientific study, including monitoring activities, among other things.  Defendants' discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendants'

1   ongoing failure to comply with the Clean Water Act.  The relief sought herein will redress the harms to

2   Plaintiff caused by Defendants' activities because that relief will significantly reduce pollution discharged

3   from Defendants' Facility into the Impacted Waters.

4       17.     Continuing commission of the acts and omissions alleged above will irreparably harm

5   Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy or adequate

6   remedy at law.

7   **IV.   LEGAL BACKGROUND**

8       **A.     Clean Water Act**

9       18.     Congress enacted the CWA to "restore and maintain the chemical, physical, and

10  biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  The CWA establishes an "interim

11  goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife

12  and provides for recreation in and on the water . . . ." 33 U.S.C. § 1251(a)(2).  To these ends, Congress

13  developed both a water quality-based and a technology-based approach to regulating discharges of

14  pollutants from point sources into waters of the United States.

15      19.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant

16  from a point source into waters of the United States, unless such discharge is in compliance with various

17  enumerated sections of the Act.  Among other things, Section 301(a) prohibits both discharges not in

18  conformance with a NPDES permit, such as discharges without a NPDES permit issued pursuant to

19  Section 402 of the Act (33 U.S.C. §1342) or discharges that violate the terms of an NPDES permit.

20      20.     The term "discharge of pollutants" means "any addition of any pollutant to navigable

21  waters from any point source." 33 U.S.C. § 1362(12).  Pollutants are defined to include, among other

22  examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into

23  water. 33 U.S.C. § 1362(6).

24      21.     A "point source" is defined as "any discernible, confined and discrete conveyance,

25  including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are

26  or may be discharged." 33 U.S.C. § 1362(14).

27      22.     "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7).

28

Waters of the United States includes, among others things, waters that are, were, or are susceptible to use in interstate commerce, and tributaries to such waters.  40 C.F.R. § 230.3 (2015).  Section 402 of the Act, 33 U.S.C. § 1342, establishes the NPDES program, a permitting program that regulates the discharge of pollutants into waters of the United States.  Section 402(p) establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. § 1342(p), and, specifically, requires an NPDES permit for storm water discharges associated with industrial activity.  33 U.S.C. § 1342(p)(2)(B).  Section 402 authorizes states with approved NPDES permit programs to regulate industrial storm water discharges, through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(b).

23.    Section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, 33 U.S.C. § 1362(5), for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. §1365(a)(1) (authorizing actions against any person alleged to be in violation of an effluent standard or limitation); 33 U.S.C. § 1365(f) (defining "effluent limitation" broadly to include "a permit or condition thereof issued under [section 402] of this title," and "any unlawful act under subsection (a) of [section 301] of this title").

24.    An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day for violations occurring after January 12, 2009 and $51,570 per day per violation for all violations that occurred after November 2, 2015, pursuant to Sections 309(d) and 505 of the Act.  33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. §§ 19.1–19.4.

**B.    State Regulations**

25.    The Act requires States to promulgate water quality standards.  *See* 33 U.S.C. §§ 1313(a)-(c).  Water quality standards consist of both "designated uses" for a body of water and a set of "criteria" specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses.  33 U.S.C. § 1313(c)(2)(A).  The Act requires States to assess whether these water quality standards are being met.

26.     The Russian River is heavily degraded from pollutant loading.  This is officially recognized by the EPA, the State Board, and the Regional Board, which has placed the waterbody on the CWA section 303(d) list of waters that are so polluted that they do not meet applicable water quality standards.  The Regional Board's Water Quality Control Plan for the North Coast Region (hereafter referred to as the "Basin Plan") is the master policy document setting forth the legal, technical, and programmatic bases of water quality regulation in the Region.  Among other things, the Basin Plan includes the water quality objectives needed to protect the designated beneficial water uses.  The Basin Plan sets forth narrative water quality objectives for sediment, settleable and suspended materials, as well as narrative objectives for preventing the impairment of water quality with oil sheens, turbidity, or other nuisance conditions.  The Basin Plan also includes numeric water quality standards for pH, dissolved oxygen and toxic pollutants as well as site specific objectives for certain pollutants of concern such as aluminum, arsenic, cadmium, chromium, lead, mercury, nitrate, endrin, benzene, 1,2-dibromo-3-chloropropane, 1,1-dichloroethane, 1,2-dichloroethane, ethylbenzene, heptachlor, and 1,1,2,2-tetrachloroethane.

27.     In addition, a rule promulgated by EPA known as the California Toxics Rule ("CTR"), discussed further below, sets Water Quality Standards ("WQS") for 126 toxic priority pollutants in California's rivers, lakes, enclosed bays, and estuaries.  The CTR applies to the Impacted Waters, and includes limits for several toxic metals, including antimony, arsenic, beryllium, cadmium, chromium, copper, lead, mercury, nickel, selenium, silver, thallium, and zinc.

### C.     California Industrial Storm Water General Permit

28.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of EPA has authorized California's State Board to issue NPDES permits in California, including general NPDES permits.

29.     The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on April 17, 1997 and again on April 1, 2014 (effective July 1, 2015), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

30.     Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent ("NOI").  The General Permit requires facilities to file their NOIs before the initiation of industrial operations.

31.     Once regulated by an NPDES permit, facilities must strictly comply with all of the terms and conditions of that permit.  A violation of the General Permit is a violation of the Act.  *See* General Permit, Section XXI.A.

32.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

33.     The General Permit contains three primary and interrelated categories of requirements: 1) discharge prohibitions; 2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and 3) monitoring and reporting requirements, including the requirement to prepare an annual report.

34.     Discharge Prohibition III.B of the General Permit prohibits discharges of liquids or materials other than storm water, either directly or indirectly to waters of the United States unless authorized by another NPDES permit or as authorized in Section IV of the General Permit.

35.     Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination or nuisance as defined in section 13050 of the California Water Code.

36.     Receiving Water Limitation VI.A of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water.

37.     Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.

38.     Effluent Limitation V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional

Pollutant Control Technology ("BCT") for conventional pollutants.

39.     EPA has established Benchmark Levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT standards.  65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  The following benchmarks have been established for pollutants discharged by Defendants: Total Suspended Solids ("TSS") – 100 mg/L; Oil & Grease ("O&G") – 15.0 mg/L; and Iron ("Fe") – 1.0 mg/L.

40.     The Regional Board has established water quality standards for the Impacted Waters in the Basin Plan.

41.     The Basin Plan includes a toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to or that produce detrimental physiological responses in, human, plant, animal, or aquatic life."  3-4.00 Basin Plan.

42.     The Basin Plan provides that "[w]aters designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the limits specified in [22 C.C.R. §§ 64435 and 64444.5]."  3-5.00 Basin Plan.  According to the 2012 303(d) List of Impaired Water Bodies, Russian River Hydrologic Unit, Middle Russian River Hydrologic Area downstream of the Facility is impaired for: Indicator Bacteria, Nitrogen, Dissolved Oxygen, Sediment/Siltation, and Temperature.

43.     EPA issued the CTR in 2000, establishing numeric receiving water limits for certain toxic pollutants in California surface waters.  40 C.F.R. § 131.38 (2013).  The CTR establishes the following applicable numeric limit for freshwater surface waters:  Arsenic – 0.34 mg/L; Cadmium – 0.0043 mg/L; Chromium (III) – 0.55 mg/L; Chromium (VI) – 0.016 mg/L; Copper – 0.013 mg/L; Lead – 0.065 mg/L; Nickel - 0.47 mg/L; Silver – 0.0034 mg/L; and, Zinc – 0.12 mg/L.

44.     The General Permit requires dischargers to develop and implement a site-specific SWPPP.  General Permit, Section X.A.  The SWPPP must include, among other elements:  (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) an annual comprehensive

facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.

45.    Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS their SWPPP not more than once every three (3) months in the reporting year for any non-significant revisions.  General Permit, Section X.B.

46.    Dischargers must implement the minimum BMPs identified in Section X.H.1. of the General Permit.  In addition to the minimum BMPs identified in Section X.H.1, advanced BMPs must be implemented if necessary to reduce or prevent discharges of pollutants in storm water dischargers in a manner that reflects best industry practice.  General Permit, Section X.H.2.

47.    Special Conditions Section XX.B of the General Permit require a discharger to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of Receiving Water Limitations, Section VI.  The documentation must describe changes the discharger will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  General Permit, Section XX.B.

48.    Section XV of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities within 90 days of the annual evaluation.

49.    The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Section IV of the General Permit unless authorized by another NPDES permit.  General Permit, Section III. B.

50.    The General Permit requires dischargers to implement a Monitoring Implementation Plan.  General Permit, Section X.I.  As part of their monitoring plan, dischargers must identify all storm water discharge locations.  General Permit, Section X.I.2.  Dischargers must then conduct monthly

visual observations of each drainage area, as well as visual observations during discharge sampling events.  General Permit, Section XI.A.1 and 2.  Dischargers must also collect and analyze storm water samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each reporting year (January 1 to June 30).  General Permit, Section XI.B.  Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters, and any other pollutants likely to be in the storm water discharged from the facility base on the pollutant source assessment.  General Permit, Section XI.B.6.

51.      Dischargers must submit all sampling and analytical results via SMARTS within thirty (30) days of obtaining all results for each sampling event.  Section XI.B.11.  Sampling results must be compared to the two types of Numeric Action Level ("NAL") values set forth at Table 2 of the General Permit.  General Permit, Section XII.  An annual NAL exceedance occurs when the average of the results for a parameter for all samples taken within a reporting year exceeds the annual NAL value.  General Permit, Section XII.A.1.  An instantaneous NAL exceedance occurs when two (2) or more results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value.  General Permit, Section XII.A.2.  If a discharger has an NAL exceedance during a reporting year, the discharger's status changes to Level 1 status under the General Permit and the discharger must comply with the requirements set forth for Level 1 status operators set forth at Section XII.C.  The discharger's status shall change to Level 2 status if sampling results indicated an NAL exceedance for a parameter while the discharger is in Level 1 status.  If a discharger becomes Level 2 status it must comply with the obligations set forth at Section XII.D of the General Permit.

52.      Dischargers must submit an Annual Report no later than July 15th following each reporting year, certifying compliance with the General Permit and/or an explanation for any non-compliance.  General Permit, Section XVI.

## V.      STATEMENT OF FACTS

53.  The Facility is an approximately 121-acre aggregate and soils processing facility and quarry.  A site map of the Facility is attached as **Exhibit B**.  Defendants' primary industrial activities at the

Facility include mining and blasting activities in an approximately 17-acre rock quarry, aggregate and rock material crushing, processing, stockpiling and recycling (concrete, tile, porcelain and asphalt shingles); and a landscape materials yard. Most of these industrial activities occur outside in areas that are exposed to storm water and storm flows due to the lack of overhead coverage, functional berms, and other storm water controls.

54. The primary industrial activities at the Facility fall under Standard Industrial Classification ("SIC") Code 1442 ("Construction Sand and Gravel").

55. Defendants collect and discharge storm water associated with industrial activities at the Facility through at least six discharge points into the drainage ditch along Stony Point Road, which drains to Washoe Creek, a tributary of Laguna de Santa Rosa, which drains to Santa Rosa Creek, which drains to Mark West Creek, which ultimately drains into the Russian River. Washoe Creek, Laguna de Santa Rosa, Santa Rosa Creek, Mark West Creek, and the Russian River are waters of the United States within the meaning of the Clean Water Act.

56. Defendants have owned and operated the Facility since at least 1987.

57. Defendants filed a Notice of Intent to comply with the General Permit on or about June 8, 2015. The Facility's Waste Discharge Identification ("WDID") number is 1 49I013793.

58. In June of 2015, Defendants uploaded to the Storm Water Multiple Application & Report Tracking System ("SMARTS") an uncertified SWPPP, labelled "DRAFT".

59. On November 22, 2017, Defendants uploaded to SMARTS an amendment to the Facility's SWPPP.

60. On January 15, 2018, Defendants uploaded to SMARTS another amendment to the Facility's SWPPP.

61. Under the General Permit, Defendants have continually sampled storm water discharges from the Facility and found levels of pollutants in the samples that exceeded on various occasions both EPA's benchmarks and the CTR values. This information was reported to the Regional Board, as required by the General Permit.

62. According to Defendants' self-monitoring reports submitted to the Regional Board,

1  Defendants have measured discharges containing levels of TSS, Nitrate plus Nitrite Nitrogen ("N+N"),

2  and pH in excess of the EPA Benchmark Values on at least sixty-nine (69) occasions since December

3  10, 2015.

4      63. Self-monitoring reports filed pursuant to an NPDES permit that report exceedances of permit

5  limitations constitute "conclusive evidence" of violations of the permit and the Act. *Sierra Club v.*

6  *Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988), *rev'd on other grounds*, 485 U.S. 931, *amended by* 853

7  F.2d 667.

8      64. Plaintiff is informed and believes, and thereupon alleges, that since at least November 14,

9  2012, Defendants have consistently discharged storm water and non-storm water containing

10 impermissible levels of TSS, N+N, pH, and other pollutants associated with Defendants' industrial

11 operations into the Impacted Waters, without complying with the terms of the General Permit.

12     65. According to Defendants' self-monitoring reports, since at least November 14, 2012,

13 Defendants have known that storm water discharged from the Facility contains concentrations of: TSS in

14 excess of EPA Benchmark Value of 100 mg/L; pH outside of EPA Benchmark range of 6.0-9.0 s.u.; and

15 N+N in excess of EPA Benchmark Value of 0.68 mg/L.

16     66. On at least twenty (20) documented occasions since December 10, 2015, the levels of TSS

17 detected by Defendants in the storm water discharged from its Facility exceeded the Benchmark Value

18 of 100 mg/L for TSS.

19     67. On at least twenty-two (22) documented occasions since December 10, 2015, the pH detected

20 by Defendants in the storm water discharged from its Facility was measured outside the EPA

21 Benchmark range of 6.0-9.0 s.u. for pH.

22     68. On at least twenty-seven (27) documented occasions since December 10, 2015, the levels of

23 N+N detected by Defendants in the storm water discharged from its Facility exceeded the Benchmark

24 Value of 0.68 mg/L for N+N.

25     69. The Facility's exceedances of EPA Benchmarks provided above indicate that Defendants

26 have not implemented BAT and BCT at the Facility for its discharges of TSS, pH, and N+N.

27     70. Plaintiff is informed and believes that Defendants' storm water controls, to the extent any

28

Complaint for Declaratory and Injunctive Relief and Civil Penalties

exist, fail to achieve BAT and BCT standards.

71. The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States and fail to meet BAT and BCT standards.

72. Information available to Plaintiff indicates that as a result of these practices, storm water containing pollutants harmful to fish, plant and bird life, and human health are being discharged from the Facility directly to the Impacted Waters during significant rain events.

73. Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.

74. Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement an adequate Storm Water Pollution Prevention Plan at the Facility.

75. Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to monitor all of the storm water outfalls at the Facility, as required by the Permit.  Defendants' SWPPP does not require or allow Defendants to take representative samples.  Defendants' failure to designate, and take samples from, every Facility discharge point is a violation of the Permit.

76. Plaintiff is informed and believes, and thereupon alleges, that Defendants have caused or contributed to the impairment of the Russian River by discharging Total Suspended Solids in excess of the applicable water quality standards such as the EPA Benchmarks.

77. Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement adequate storm water monitoring, reporting and sampling programs at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that Defendants have not sampled with adequate frequency, has not sampled all discharge points, has not analyzed the storm water samples collected at the Facility for all of the required pollutant parameters, and has not used the correct test methods to analyze their storm water samples.

78. Plaintiff is informed and believes, and thereupon alleges, that Defendants have discharged, and continue to discharge, unauthorized non-storm water from the Facility.

79. Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Failure to Develop and Implement an Adequate
Storm Water Pollution Prevention Plan For the Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

80. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

81. Section X of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP prior to commencement of industrial activities.

82. Defendants have failed to develop and implement an adequate SWPPP for the Facility. Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendants' outdoor storage of industrial materials without appropriate best management practices; the failure to identify all discharge locations and drainage areas; the lack of specificity and detail required by the General Permit; the failure to include a compliant site map; the failure to keep the SWPPP updated with a log to mark additions; the continued exposure of significant quantities of industrial materials to storm water flows; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values and other applicable standards.

83. Defendants have further failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring as required by the General Permit. General Permit, Sections X.B.1 and X.C.1.b.

84. Defendants continue to violate the Act each day that it fails to develop and fully implement an adequate SWPPP for the Facility. These violations are ongoing and continuous.

85. Each day that Defendants have failed to develop and implement an adequate SWPPP for the

Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since November 14, 2012.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4.

## SECOND CLAIM FOR RELIEF

### Failure to Develop and Implement the Best Available
### And Best Conventional Treatment Technologies at the Facility
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

86. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

87. The General Permit's SWPPP requirements and Effluent Limitation V.A. require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

88. Defendants have failed to implement BAT and BCT at the Facility for its discharges of Total Suspended Solids, pH, and Nitrate plus Nitrite Nitrogen in violation of Effluent Limitation V.A. of the General Permit.

89. Defendants' ongoing failure to implement BAT and BCT at the Facility is evidenced by, *inter alia*, Defendants' chronic exceedances of EPA benchmarks.

90. Each day that Defendants have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

91. Defendants continue to be in violation of the BAT and BCT requirements each day that it fails to develop and fully implement BMPs meeting the BAT and BCT standards. These violations are ongoing and continuous.

92. Defendants have been in violation of the BAT and BCT requirements at the Facility every day since at least November 14, 2012.  Defendants are subject to civil penalties for each and every violation of the Act since November 14, 2012.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4.

## THIRD CLAIM FOR RELIEF

Complaint for Declaratory and Injunctive Relief and Civil Penalties

**Failure to Develop and Implement an Adequate
Monitoring Implementation Plan for the Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

93. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

94. Section X.I and Section XI. of the General Permit require dischargers of storm water associated with industrial activity to develop and implement a monitoring implementation plan (including, among other things, sampling and analysis of discharges) prior to commencement of industrial activities.

95. Defendants have failed to develop and implement an adequate monitoring implementation plan for the Facility.  Defendants' ongoing failure to develop and implement adequate monitoring and reporting programs are evidenced by, *inter alia*, its continuing failure to collect and analyze storm water samples from all discharge locations, its continuing failure to analyze storm water samples for pollutants likely to be present in the Facility's storm water discharges in significant quantities and other pollutants as the General Permit requires.  For example, Defendants have not analyzed samples of storm water for levels of iron, in violation of Monitoring provision XI.B.6.c of the permit.

96. Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility each day since at least November 14, 2012.  These violations are ongoing and continuous.

97.  Each day of violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since November 14, 2012.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4.

**FOURTH CLAIM FOR RELIEF**

**Failure to Complete Required Exceedance Response Actions
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

98. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

99. Section XII.A of the General Permit requires dischargers to compare the results of their sampling to the two types of Numeric Action Level ("NAL") values in Table 2 of the General Permit to determine, for each applicable parameter, whether either type of NAL has been exceeded.  If sampling results indicate that a NAL is exceeded, the discharger enters "Level 1 status" for that parameter.  *Id.* § XII.C.

100. By October 1 following the commencement of Level 1 status for any parameter, the discharger shall complete an evaluation, with the assistance of a Qualified Industrial Storm Water Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s) and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances.  Id. § XII.C.1.

101. Based on the above evaluation, the discharger shall, no later than January 1 following the commencement of Level 1 status: revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation; certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report, prepared by a QISP, that includes a summary of the evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL; and certify and submit via SMARTS the QISP's identification number, name, and contact information. Id. § C.2.

102. Defendants commenced Level 1 status for TSS and N+N on July 1, 2016.

103. Defendants did not complete an adequate evaluation as required by Section XII.C.1 of the 2015 General Permit by October 1, 2016.  The evaluation lacks sufficient detail regarding the industrial pollutant sources at the Facility that are or may be related to the NAL exceedances.  2015 General Permit, Section XII.C.1.  Defendants also failed to evaluate all drainage areas, such as the drainage areas not identified in the SWPPP or site map.

104. Defendants did not submit to SMARTS a Level 1 ERA Report that complies with the requirements of Section XII.C.2 of the 2015 General Permit.  The Level 1 ERA Report dated December 2016 was uploaded, but not certified, to SMARTS on January 28, 2017 in violation of the General Permit's requirement that it be certified and uploaded no later than January 1 following the

Complaint for Declaratory and Injunctive Relief and Civil Penalties

commencement of Level 1 status.  General Permit, XII.C.2.a.  In that report Defendants failed to include an adequate "summary of the Level 1 ERA Evaluation" required in subsection XII.C.1 of the 2015 General Permit.  Specifically, the report does not provide a detailed description of the SWPPP revisions.

105.    Despite finding their SWPPP to be deficient in a number of ways, Defendants failed to revise the SWPPP to resolve those deficiencies.

106.    Each day Defendants failed to properly complete the evaluation is a violation of the General Permit.  Defendants have been in violation of this requirement every day since October 2, 2016. In addition, each day Defendants failed to complete the Level 1 ERA Report is a violation of the General Permit.  Defendants have been in violation of this requirement every day since January 2, 2016.

107.    Each day of violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since November 14, 2012.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4.

## FIFTH CLAIM FOR RELIEF

**Discharges of Contaminated Storm Water From The Facility
in Violation of the Permit's Water Quality-Based Conditions and the Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

108. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

109. Receiving Water Limitations VI.A and VI.B of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water.  Discharge Prohibition III.C of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.

110. Plaintiff is informed and believes, and thereupon alleges, that since at least November 14, 2012, Defendants have been discharging polluted storm water from the Facility into the Impacted Waters,

in violation of the General Permit's Water Quality-based conditions.

111. During every significant rain event, storm water flowing over and through materials at the Facility becomes contaminated with pollutants, flowing untreated from the Facility to the Impacted Waters

112. Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of waters of the United States in violation of Discharge Prohibition III.C of the General Permit.

113. Plaintiff is informed and believes, and thereupon allege, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations VI.A and VI.B of the General Permit.

114. Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are contributing to the violation of the applicable water quality standards in the Statewide Water Quality Control Plan, the applicable Regional Board's Basin Plan, and/or the CTR, in violation of Receiving Water Limitation VI.A of the General Permit because Defendants' storm water discharges contain high levels of suspended solids which contribute to the Russian River's sediment impairment.

115. Plaintiff is informed and believes, and thereupon alleges, that on every day with significant rainfall since November 14, 2012, Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit. These violations are ongoing and continuous.

116. Every day Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since November 14, 2012.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4.

## VII.    RELIEF REQUESTED

Wherefore, CSPA respectfully requests that this Court grant the following relief:

a.   Declare Defendants to have violated and to be in violation of CWA section 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from the Facility not in compliance with a permit issued pursuant to CWA section 402, 33 U.S.C. § 1342, and for failing to comply with all substantive and

1   procedural requirements of the General Permit and the CWA as alleged herein.

2           b.   Enjoin Defendants from discharging pollutants from the Facility and to the surface

3   waters surrounding and downstream from the Facility in violation of the Act and the General Permit;

4           c.   Enjoin Defendants from further violating the substantive and procedural requirements

5   of the General Permit and the Act;

6           d.   Order Defendants to pay civil penalties of $37,500 per day per violation for all

7   violations occurring after November 14, 2012 and $51,570 per day per violation for all violations

8   occurring after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§

9   1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4;

10          e.   Order Defendants to take appropriate actions to restore the quality of navigable waters

11  impaired by their activities;

12          f.   Award Plaintiff's costs and fees (including reasonable attorney, witness, and

13  consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

14          g.   Award any such other and further relief as this Court may deem appropriate.

15  Dated: January 17, 2018                    Respectfully Submitted,

16                                             LAW OFFICES OF ANDREW L. PACKARD

17                                             By: /s/ William N. Carlon

18                                                 William N. Carlon
                                                   Attorney for Plaintiff
19                                                 CALIFORNIA SPORTFISHING
                                                   PROTECTION ALLIANCE
20

21

22

23

24

25

26

27

28

Complaint for Declaratory and Injunctive Relief and Civil Penalties